**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KELCI STRINGER,** | : | |
| **Plaintiff,** | : | **Case No. 2:03-cv-665** |
| **v.** | : | **Judge Holschuh** |
| **NATIONAL FOOTBALL LEAGUE,** **et al.,** | : | **Magistrate Judge Abel** |
| | : | |
| **Defendants.** | : | |
| | : | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kelci Stringer, on behalf of herself and the estate of Korey Stringer, and on behalf of a class of similarly-situated persons, brought this wrongful death/survivorship action and class action complaint for injunctive relief against the National Football League ("NFL"), NFL Properties LLC ("NFL Properties"), and John Lombardo, M.D. (hereinafter collectively "NFL Defendants"), and against Riddell, Inc., also doing business as Riddell Sports Group, Inc., Riddell/All American, and All American Sports Corporation (hereinafter collectively "Riddell Defendants").

This matter is before the Court on the NFL Defendants' motion to dismiss or, in the alternative, motion for summary judgment (Record at 7), and on the Riddell Defendants' motion for judgment on the pleadings (Record at 20). Defendants all contend that Plaintiff's claims are preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). On December 12, 2005, the Court heard oral arguments on the NFL Defendants' motion. The parties then conducted limited discovery and submitted supplemental briefs.

I.      **Procedural History and Nature of Claims**

Korey Stringer was a 27-year-old Pro Bowl offensive lineman for the Minnesota Vikings ("Vikings").  (Compl. at ¶ 1).  In July 2001, Stringer participated in the Vikings' summer training camp in Mankato, Minnesota.  On July 30, 2001, he suffered heat exhaustion during practice.  The next day, during a morning practice, Korey Stringer developed heatstroke.  He died from complications of heatstroke at 1:50 a.m. on August 1, 2001.  (Id. at ¶ 11).

Kelci Stringer, Korey Stringer's widow and the personal representative of his estate, filed a five-count complaint.  Plaintiff generally alleges that Korey Stringer was forced to participate in practices conducted in extreme heat and humidity while wearing unsafe, heat-retaining, league-mandated equipment and without proper acclimatization, supervision, or medical care.  (Id. at ¶ 2).

On May 17, 2006, the parties stipulated to a dismissal of Count 2 of the complaint, a negligence claim against John Lombardo, M.D.  Plaintiff has also voluntarily dismissed Count 5 of the complaint, which sought injunctive relief against all defendants on behalf of a class of NFL football players and their families.  Therefore, only Counts 1, 3, and 4 of the complaint remain pending.  Counts 1 and 4 assert claims of negligence against the NFL and NFL Properties.  Count 3 asserts products liability claims against the Riddell Defendants.

The NFL is an unincorporated association of football teams, including the Vikings, which promotes, organizes and regulates professional football in the United States.  (Id. at ¶ 6).  In Count 1 of the complaint, Plaintiff alleges that the NFL breached its duty to NFL players, including Korey Stringer, to use ordinary care in overseeing, controlling, and regulating practices, policies, procedures, equipment, working conditions and culture of the NFL teams,

including the Vikings, to minimize the risk of heat-related illness.  (Id. at ¶ 30).  Plaintiff also

alleges that the NFL failed to provide complete, current and competent information and

directions to NFL athletic trainers, physicians and coaches regarding heat-related illness and its

prevention, symptoms and treatment.  (Id. at ¶ 20).

The Riddell Defendants are Delaware corporations engaged in the development, design,

manufacture, sale, and distribution of football equipment, including helmets and shoulder pads.

(Id. at ¶ 9).  The Riddell Defendants are the sole license holders of helmets for NFL teams and a

principal supplier of shoulder pads to NFL teams.  (Id.).  In Count 3 of the complaint, Plaintiff

alleges that the Riddell Defendants' helmets and shoulder pads were negligently designed and/or

manufactured because they act as an insulating "blanket," preventing evaporation and heat

dissipation.  According to Plaintiff, this unreasonably increases a player's body temperature and

can lead to heat-related illness.  (Id. at ¶ 46).  Plaintiff seeks recovery under theories of

negligence, strict products liability, breach of warranty, and failure to warn.  (Id. at ¶ 52).

NFL Properties is a California corporation with its principal place of business in New

York.  It is responsible for approving, licensing, and promoting the equipment used by NFL

teams.  (Id. at ¶ 7).  Count 4 of the complaint alleges that NFL Properties breached its duty to

ensure that the equipment and materials it licensed and approved were of the highest possible

quality and sufficient to protect players from the risk of injury, including an increased risk of

heat-related illness.  In particular, Plaintiff contends that NFL Properties breached this duty by

licensing the Riddell Defendants' helmets and approving their shoulder pads for use by NFL

teams and players, knowing or having reason to know that those products were negligently and

defectively designed and/or manufactured.  (Id. at ¶ 67).  Count 4 also alleges that the NFL had a

duty to ensure that the equipment it required NFL players to wear was safe and did not

unnecessarily increase the risk of heat-related illness.  The NFL allegedly breached that duty by

requiring and/or approving use of Riddell's helmets and shoulder pads.

## II.    Law Governing Preemption

Defendants all argue that Plaintiff's claims must be dismissed because they are

preempted by § 301 of the Labor Management Relations Act ("LMRA").  That statute provides,

in relevant part:

> Suits for violation of contracts between an employer and a labor
> organization representing employees in an industry affecting
> commerce . . . may be brought in any district court of the United
> States having jurisdiction of the parties, without respect to the
> amount in controversy or without regard to the citizenship of the
> parties.

29 U.S.C. § 185(a).

The Supreme Court first explained the preemptive effect of § 301 in Teamsters v. Lucas

Flour Company, 369 U.S. 95 (1962).  "The subject matter of § 301(a) 'is peculiarly one that calls

for uniform law.'. . . The possibility that individual contract terms might have different meanings

under state and federal law would inevitably exert a disruptive influence upon both the

negotiation and administration of collective agreements."  Id. at 103 (quotations omitted).  "The

interests in interpretive uniformity and predictability that require that labor-contract disputes be

resolved by reference to federal law also require that the meaning given a contract phrase or term

be subject to uniform federal interpretation."  Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 211

(1985).  As the Supreme Court stated in Franchise Tax Board v. Construction Laborers Vacation

Trust, 463 U.S. 1, 23 (1983), the pre-emptive force of § 301 "is so powerful as to displace

entirely any state cause of action" for violation of a collective bargaining agreement.

4

The Supreme Court has made it clear that § 301 preemption applies not only to contract claims, but also to tort claims:

> [Q]uestions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.

Allis-Chalmers, 471 U.S. at 217.[1]  See also Livadas v. Bradshaw, 512 U.S. 107, 122-24 (1994); Smolarek v. Chrysler Corp., 879 F.2d 1326, 1329 (6th Cir. 1989).  The Supreme Court has cautioned, however, that not every tort claim relating to employment is subject to preemption under § 301.  Those tort claims that are "independent" of the collective bargaining agreement are not subject to preemption.  Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399, 409-10 (1988); Allis-Chalmers, 471 U.S. at 213.  See also Smolarek, 879 F.2d at 1330.

The Sixth Circuit has adopted a two-step approach to determine whether a state-law tort claim is sufficiently "independent" to survive § 301 preemption.  A court must "ascertain whether the right claimed by the plaintiff is created by the collective bargaining agreement or by state law."  DeCoe v. General Motors Corp., 32 F.3d 212, 216 (6th Cir. 1994).  If the right is created by the collective bargaining agreement, the claim will be preempted by § 301.  If not, then the court must "examine whether proof of the state law claim requires interpretation of collective bargaining agreement terms."  Id. (citing Terwilliger v. Greyhound Lines, Inc., 882 F.2d 1033, 1037 (6th Cir. 1989), cert. denied, 495 U.S. 946 (1990)).  If resolution of the state

---

[1]  The court must look "to the essence of the plaintiff's claim, in order to determine whether the plaintiff is attempting to disguise what is essentially a contract claim as a tort."  DeCoe v. General Motors Corp., 32 F.3d 212, 216 (6th Cir. 1994).

law claim is "substantially dependent" on an analysis of the terms of the collective bargaining agreement, or "inextricably intertwined" with it, the claim will be preempted by § 301.  <u>Allis-Chalmers</u>, 471 U.S. at 220.  However, "neither a tangential relationship to the CBA, nor [a] defendant's assertion of the contract as an affirmative defense [can] turn an otherwise independent claim into a claim dependent on the labor contract."  <u>DeCoe</u>, 32 F.3d at 216 (<u>citing</u> <u>Fox v. Parker Hannifin Corp.</u>, 914 F.2d 795, 800 (6th Cir. 1990)).  "When the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished."  <u>Livadas</u>, 512 U.S. at 124.

In this case, Defendants argue that Plaintiff's claims are preempted by § 301 because the claims present disputes over "working conditions."  They contend that the collective bargaining agreement ("CBA"), entered into by the National Football League Management Council ("NFLMC") and the National Football League Players Association ("NFLPA"), is the only logical source of the duties allegedly breached.  In the alternative, they argue that resolution of Plaintiff's claims will require interpretation of the terms of the CBA.  Plaintiff, on the other hand, argues that her claims are not preempted by § 301 since they are based solely on common law tort principles and can be resolved without interpreting any provisions of the CBA.

## III.  Effect of Defendants' Status as Non-Signatories to CBA

Before deciding whether Plaintiff's claims against either group of defendants are preempted, the Court must address Plaintiff's threshold argument that because Defendants are not signatories to the CBA, they are precluded from raising a defense of preemption under § 301. Plaintiff's argument lacks merit.  She fails to recognize that there is a distinction between the

concepts of subject matter jurisdiction based on § 301 and the preemption of claims required by § 301.

This distinction is illustrated in International Union, United Mine Workers of America v. Covenant Coal Corporation, 977 F.2d 895 (4th Cir. 1992).  In that case, a union sued a coal company that was not a party to the union's CBA, basing the court's jurisdiction on § 301, and alleging tortious interference with the CBA.  The court concluded that because the coal company was not a party to the CBA, it "cannot be sued under the jurisdiction established by section 301." Id. at 899.  The court explained that because § 301 provides a cause of action for breach of a collective bargaining agreement, "suit may be brought only against the parties to the contract." Id. at 898 (quotation omitted).  The court held, however, in an "apparent paradox," that the union's state law claim of tortious interference with the CBA was preempted because, under Virginia state law, such a claim required a breach or termination of the contractual relationship. This, in turn, required a court to interpret the CBA between the union and the other mining companies in order to determine whether the non-union defendant's actions had actually caused a breach of those collective bargaining agreements.  Id. at 899-900.

In support of her argument, Plaintiff cites the case of Metropolitan Detroit Bricklayers District Council v. J.E. Hoetger Co., 672 F.2d 580 (6th Cir. 1982), in which the Sixth Circuit recognized that "courts have generally held that [section 301] creates federal jurisdiction only over parties to the contract being sued upon." Id. at 583.  Plaintiff also cites Service, Hospital, Nursing Home, and Public Employees Union v. Commercial Property Services, Inc., 755 F.2d 499, 506 (6th Cir.), cert. denied, 474 U.S. 850 (1985), in which the Sixth Circuit held that "a district court does not have subject matter jurisdiction over a non-signatory to a collective

7

bargaining agreement, where no rights or duties are stated in the terms and conditions of the agreement." 755 F.2d at 506.  However, in each of those cases, the plaintiff filed suit directly under § 301, seeking to recover against a non-signatory to the collective bargaining agreement, and the courts were required to decide whether they had subject matter jurisdiction over those federal claims.  In contrast, in the instant case, this Court's jurisdiction is based solely on diversity of citizenship.  Plaintiff has not asserted any claims under § 301.  She has asserted only state law claims.

The question before this Court is whether non-signatories to a CBA can invoke § 301 preemption as a <u>defense</u> to a plaintiff's state law claims.  Several courts have held that they can. <u>See</u> <u>Covenant Coal</u>, 977 F.2d at 899-900; <u>Dashields v. Robertson</u>, No. 99-1124, 2000 WL 564024, at **2 n.3 (4th Cir. May 10, 2000) ("section 301 can preempt claims against non-signatories to a collective bargaining agreement"); <u>Mullins v. International Union of Operating Eng'rs Local No. 77</u>, 214 F. Supp. 2d 655, 668 (E.D. Va. 2002)(holding that § 301 preempts state claims against non-signatories where interpretation of the collective bargaining agreement is required for resolution).  <u>See also</u> <u>Golden v. Kelsey-Hayes Co.,</u> 878 F. Supp. 1054, 1056-57 (E.D. Mich. 1995) (holding that plaintiff's state law claim against a non-signatory to the CBA was preempted by § 301).  Plaintiff has cited to no authority to the contrary.

The Court therefore finds that Defendants' status as non-signatories to the CBA does not prevent them from raising the preemption defense.  The Court then turns to the preemption arguments raised by Defendants in their respective motions.

IV.    **NFL Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment**

A.    **Standard**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the NFL Defendants have moved to dismiss the claims asserted against them as preempted by § 301 of the LMRA.  In the alternative, they have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  In connection with their motion, the NFL Defendants have submitted a copy of the NFL Collective Bargaining Agreement 2002-2008 ("CBA") entered into between the NFLPA and the NFLMC.[2] The NFLPA is the bargaining representative for the NFL players, and NFLMC is the bargaining representative for the thirty-two clubs of the NFL. (CBA Preamble; Dennis Curran Aff. ¶ 2, Ex. 1 to Mot. to Dismiss).

Because the NFL Defendants have submitted matters outside the pleadings, the Court must convert their motion to dismiss into a motion for summary judgment unless it excludes those documents.  <u>Max Arnold & Sons, LLC v. W.L. Hailey & Co.</u>, 452 F.3d 494, 503 (6th Cir. 2006); Fed. R. Civ. P. 12(b) ("If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.")

Ordinarily, a court must give notice to a party opposing a motion to dismiss prior to converting that motion to a motion for summary judgment.  <u>Ball v. Union Carbide Corp.</u>, 385

---

[2]A copy of the CBA has been attached as Exhibit A to the Declaration of Dennis L. Curran, which is attached to the NFL Defendants' motion to dismiss.

F.3d 713, 719 (6th Cir. 2004).  However, where, as here, a motion for summary judgment has

been filed in the alternative and the opposing party responds to that motion by submitting

materials outside the pleadings, there is no surprise or prejudice that would prevent the Court

from converting the Rule 12 motion to a Rule 56 motion for summary judgment.  Id.  See also

Johnson v. Delphi Corp., 261 F. Supp. 2d 955, 958 n.4 (S.D. Ohio 2003); Max Arnold, 452 F.3d

at 504.  This Court will therefore treat the NFL Defendants' motion as one for summary

judgment under Rule 56.[3]

## B.      Preemption Analysis

In order to determine whether Plaintiff's claims against the NFL Defendants are

preempted, the Court must follow the two-step approach set forth by the Sixth Circuit in DeCoe

and its progeny.  A tort claim will be preempted if: (1) it arose from the CBA or (2) resolution of

the claim is substantially dependent on an analysis of the terms of the CBA, or is inextricably

intertwined with it.  See DeCoe, 32 F.3d at 216.

Both of Plaintiff's remaining claims against the NFL Defendants are grounded in

negligence.  To succeed on a negligence claim, Plaintiff must establish that: (1) the defendant

owed a duty; (2) the defendant breached that duty; (3) the plaintiff suffered injury; and (4) the

defendant's breach was the proximate cause of the injury.  See Louis v. Louis, 636 N.W.2d 314,

---

[3] Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be
rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on
file, together with the affidavits, if any, show that there is no genuine issue as to any material
fact and that the moving party is entitled to judgment as a matter of law."

318 (Minn. 2001).[4]

### 1.    Count 1 (against the NFL)

Plaintiff's first claim for relief, a wrongful death claim asserted against the NFL, alleges

that:

> [t]he NFL had and has the duty to use ordinary case [sic] in
> overseeing, controlling, and regulating the member clubs'
> practices, policies, procedures, equipment, working conditions,
> and culture, insofar as they pertain to and subject players to heat-
> related illness, including, but not limited to, the duty to institute
> acclimatization requirements and to regulate training camp
> practices, other practices, games, equipment, and medical care so
> as to minimize the risk of heat-related illness.

(Compl. at ¶ 30).  More specifically, Plaintiff alleges that the NFL breached its duty to NFL

players by failing to establish regulations and procedures:

- for practicing during hot and/or humid conditions;
- to ensure proper acclimatization of players before they participate in full practices;
- for the adequate care and monitoring of players suffering heat-related illness;

---

[4]  As a federal court whose jurisdiction is based on diversity of citizenship, this Court must apply the choice-of-law rules of the state in which it sits.  In Ohayon v. Safeco Insurance Co., 91 Ohio St. 3d 474, 476, 747 N.E.2d 206, 208 (2001), the Ohio Supreme Court held that "different choice-of-law rules apply depending on whether the cause of action sounds in *contract* or in *tort*."  In tort actions, Ohio has adopted the approach set forth in Restatement (Second) of Conflict of Laws.  See Muncie Power Prod., Inc. v. United Tech. Auto., Inc., 328 F.3d 870, 873-74 (6th Cir. 2003) (citing Morgan v. Biro Mfg. Co., 15 Ohio St. 3d 339, 342, 474 N.E.2d 286 (1984)).  In wrongful death actions, § 175 of the Restatement creates a presumption in favor of the law of the place where the injury occurred, in this case, Minnesota.  This presumption can be overcome by a showing that another state has a more significant relationship to the action.  Id.
Citing Mecanique CNC, Inc. v. Durr Environmental, Inc., 304 F. Supp. 2d 971, 975 (S.D. Ohio 2004), Plaintiff argues that the Court must apply Ohio law because the NFL Defendants have failed to establish that there is any true conflict between the laws of Ohio, Minnesota, and New York.  But Mecanique was a contract case.  Ohio's choice-of-law rules governing tort actions require this Court to apply Minnesota law, the law of the place where the injury occurred, absent proof that another state has a more significant relationship to the action.

- to require that an adequate heat-related illness history be taken;
- to ensure accurate diagnosis and recording of heat-related illness so the condition can be treated in an adequate and timely manner;
- for the regulation of individual team policies, practices and procedures regarding hydration, diet, nutrition and return to practice insofar as such matters pertain to heat-related illness;
- regarding the licensing and approval of equipment in order to diminish the risk of heat-related illness; and
- to ensure proper and timely emergency medical care for players so that athletic trainers and physicians would be prepared to deal with life-threatening situations associated with heat-related illness.

(Id. at ¶ 21). Plaintiff further alleges that the NFL fosters a culture that subjects players to the risk of heat-related injury, and condones, and forces players to submit to, a substandard medical system composed of athletic trainers and team physicians who are not trained to recognize or treat heat-related illness. (Id.).

### a. Plaintiff's Claim Does Not Arise from the CBA

The first question in the preemption analysis concerns the source of the duty allegedly breached. The NFL argues that because Plaintiff's claim essentially constitutes a dispute over the players' "working conditions," the CBA is the only realistic source of that duty. Plaintiff, however, denies that her claim arises out of any CBA provision. She argues that, "[n]o heat-related duty was assigned to or assumed by the NFL or any other defendant in the CBA. Rather, the duties owed by movants . . . to Korey Stringer could only have arisen from common law principles." (Mem. in Opp'n at 3-4). Plaintiff maintains that her claim is based on "the bedrock principle of common law negligence." (Id. at 4). She describes the common law duty on which she relies as follows:

It is well settled that a voluntary act gratuitously undertaken must be performed with the exercise of due care under the circumstances. This most basic tort duty arises by operation of law and applies to every person in society, regardless of the identity of

12

the wrongdoer or the victim.

Id. at 23 (citing Glanzer v. Shepard, 135 N.E. 275, 276 (N.Y. 1922)).

In addition, Plaintiff relies on §§ 323 and 324A of Restatement (Second) of Torts

(1965).[5]  Section 323 provides:

> One who undertakes, gratuitously or for consideration, to render
> services to another which he should recognize as necessary for the
> protection of the other's person or things, is subject to liability to
> the other for physical harm resulting from his failure to exercise
> reasonable care to perform his undertaking, if
>
> > (a) his failure to exercise such care increases the risk of
> > such harm, or
> > (b) the harm is suffered because of the other's reliance upon
> > the undertaking.

Section 324A, which is similar but involves liability to third parties,

states:

> One who undertakes, gratuitously or for consideration, to render
> services to another which he should recognize as necessary for the
> protection of a third person or his things, is subject to liability to
> the third person for physical harm resulting from his failure to
> exercise reasonable care to protect his undertaking, if
>
> > (a)   his failure to exercise reasonable care increases the
> > risk of such harm, or
> > (b)   he has undertaken to perform a duty owed by the other
> > to the third person, or
> > (c)   the harm is suffered because of reliance of the other or
> > the third person upon the undertaking.

---

[5]  These Restatement sections have been adopted by Minnesota courts.  See Isler v.
Burman, 232 N.W. 2d 818, 822 (Minn. 1975) (adopting § 323); Erickson v. Curtis Investment
Co., 447 N.W. 2d 165, 170 (Minn. 1989) and Laska v. Anoka County, 696 N.W. 2d 133, 139
(Minn. Ct. App. 2005) (adopting § 324A).

At oral argument, Plaintiff's counsel explained that the claim set forth in Count 1 of the complaint is predicated on the theory that the NFL's decision to voluntarily issue certain "Hot Weather Guidelines" for the protection of NFL players gave rise to a common law duty to exercise reasonable care.  Those Hot Weather Guidelines were first published in the NFL's 1991 Game Operations Manual, and were republished in the 2001 Game Operations Manual, which was in effect at the time of Stringer's death.[6]  (Defs.' Supp. Resp. to Pl.'s Second Set of Interrog.; Ex. 2 to Pl.'s Mot. for Class Certification).

According to Plaintiff, the NFL had no contractual duty to issue the guidelines or to protect NFL players from the risk of heat-related illness.  The individual clubs were responsible for their own players' health and safety.  Plaintiff argues, however, that in issuing the guidelines, "the NFL assumed the duty 'to provide complete, current and competent information and

---

[6]  The NFL argues that the Game Operations Manual containing the guidelines is "of no significance" because, as its name suggests, it regulates only the conduct of NFL games, and does not regulate conduct of preseason training camps which are overseen by the individual clubs.  (Davey Decl. ¶¶ 3-4; Ex. to Defs.' Supp. Mem.).  This argument, however, is contradicted by the deposition testimony of former NFL Commissioner Paul Tagliabue, taken in the related case, Stringer v. Minnesota Vikings Football Club, and filed in the Minnesota state courts. Tagliabue testified as follows:

> Q.   Is heat during training camp one of the subjects that the NFL is empowered to create rules for?
> A.   I think that the climatic conditions for playing the game and practicing are generally within the area that we have some responsibility and the authority for, yes.
> Q.   Prior to the death of Korey Stringer, did you enact rules or did the NFL enact rules governing how teams needed to handle heat during training camp?
> A.   I think we had some guidelines or policies on the matter, yes.
> Q.   Do you know where those were contained?
> A.   In our administrative operations materials.

(Tagliabue Dep. at 95-96, Ex. 4 to Pl.'s Mot. for Class Certification)(emphasis added).

14

directions to NFL athletic trainers, physicians, and coaches about heat-related illness and its prevention, symptoms, and treatment.'" (Mem. in Opp'n at 4) (quoting Compl. at ¶ 8).  She maintains that the Hot Weather Guidelines are incomplete and contrary to the best practices established for the prevention and treatment of heat-related illness, and that the issuance of those guidelines therefore increased the risk to the players, and caused the individual clubs to forego other precautions.

The Court finds, for several reasons, that this claim, as characterized by Plaintiff's counsel at oral argument, does not arise from the CBA.  Significantly, neither the Hot Weather Guidelines nor the Game Operations Manual is incorporated into the CBA.  Moreover, the NFL is not a party to the CBA and is not contractually obligated to take any action to protect NFL players from illness or injury.

The CBA does contain several provisions concerning player safety, the players' right to medical treatment, and pre-season training camps.  For example, the CBA creates a Joint Committee on Player Safety and Welfare "for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects."  (CBA, Art. XIII, § 1(a)).  However, the Joint Committee consists only of three Club representatives and three NFLPA representatives. The NFL has no representative on the committee.  (Id.).  While the NFL is required to give "serious and thorough consideration" to recommendations of the Joint Committee, the CBA imposes no independent duty on the NFL to consider health risks arising from adverse playing conditions, or to make recommendations for rules, regulations or guidelines for the clubs to follow.  (Id.).

15

The CBA also contains several provisions related to medical care and treatment of NFL players.  These provisions: (1) require the individual club to pay all medical expenses and provide a board-certified orthopedic surgeon as one of its team physicians; (2) require the team physician to notify a player in writing of any physical condition which could be significantly aggravated by continued performance on the field; (3) require all full-time head trainers and assistant trainers to be certified by the National Athletics Trainers Association; (4) give the player a right to a second opinion and a surgeon of his choice; (5) require players to undergo a pre-season physical examination; and (6) regulate the use of anabolic steroids, drugs, and alcohol.  (CBA, Art. XLIV).  While these provisions impose specific duties on the individual clubs and players, and bestow on the players certain rights related to their medical care, nothing in this Article creates any duty, on the part of the NFL, to provide medical information and guidance to the individual clubs concerning how to prevent or treat illness or injury among the clubs' employees.[7]

In addition, the CBA regulates some aspects of the clubs' pre-season training camps.  For example, clubs are required to provide room and board, per diem payments, and telephones

---

[7] In its supplemental memorandum, the NFL urges the Court to find that Plaintiff's claim arises out of the CBA because the duty that was allegedly voluntarily assumed by the NFL, i.e., the duty to protect players from the risk of heat-related illness, is part of this larger duty imposed by the CBA on the individual clubs, i.e., the duty to provide medical care to NFL players.  The Court notes, however, that the Hot Weather Guidelines were first published in 1991.  At that time, there was no CBA in effect.  An earlier agreement had expired in 1987.  See Tice v. Pro Football, Inc., 812 F. Supp. 255, 256 n.2 (D.D.C. 1993); Brown v. Pro Football, Inc., 782 F. Supp. 125, 129 (D.D.C. 1991).  The CBA in effect at the time of Stringer's death was not executed until May 6, 1993. (CBA, Introduction and Preamble).  More importantly, as discussed at the end of this subsection, the relevant inquiry, for purposes of this prong of the test, is how the duty allegedly owed came into being.  In this case, the duty allegedly owed arose solely because the NFL voluntarily undertook the task of issuing Hot Weather Guidelines; it does not have its source in the CBA.

during training camp.  (CBA, Art. XXXVII).  But the CBA imposes no duty on the NFL to

protect the players from injury or illness during training camp.

     As the NFL Defendants note in their reply brief, the CBA does expressly impose some

duties on them.[8]  However, they have cited to no provision in the CBA that expressly or

impliedly imposes on the NFL the duty to take any action to protect NFL players from the risk of

heat-related illness.

     Moreover, the cases cited by the NFL in support of its argument that Plaintiff's claims

arise out of the CBA are factually and legally distinguishable.  The NFL argues that this case is

controlled by the Supreme Court's decision in United Steel Workers of America, AFL-CIO-CLC

v. Rawson, 495 U.S. 362 (1990).  After ninety-one miners were killed in an underground fire,

surviving family members filed a wrongful death suit against the miner's union, claiming that the

union had been negligent in inspecting the mine.  The Idaho Supreme Court found that the claim

was not preempted because the union's duty to inspect the mine arose from state law.  The

Supreme Court disagreed, finding that the duty allegedly breached arose out of the collective

bargaining agreement, and that plaintiffs' claim was therefore preempted by § 301.  Id. at 371.

     Rawson is distinguishable on several grounds.  First, the defendant in that case, the

union, was a party to the collective bargaining agreement; in contrast, the NFL is not a party to

---

    [8]  For example, the NFL is required to: bargain in good faith with the NFLPA over
material changes in the NFL Constitution and Bylaws that affect terms and conditions of player
employment; use its best efforts to secure orientation time for NFLPA representatives; impose a
fine on any club that violates certain commitments; notify NFLPA of any proposed rule changes;
allow arbitration of NFL rule changes that may "adversely affect player safety;" and share
arbitration costs.  In addition, the NFL and its affiliates are prohibited from acquiring Group
Player Licensing rights, and must allow players to share in the revenues of NFL Properties.
(Defs.' Reply at 5-6) (citing various CBA provisions).

the CBA.  Second, the union in Rawson, as part of the collective bargaining agreement, contractually assumed the duty to protect workers from mining accidents; in contrast, there is no evidence that the NFL contractually assumed any duty to protect NFL players from heat-related illness or injury.  Third, and perhaps most important, the allegations in plaintiffs' complaint in Rawson specifically referred to the collective bargaining agreement as the source of the duty that was breached, and answers to interrogatories echoed plaintiffs' theory that members of the joint safety committee -- a committee created by the collective bargaining agreement -- were negligent in their inspection of the mine.  Here, however, as the NFL Defendants concede, the complaint makes no mention of the CBA, and Plaintiff has never asserted that the NFL negligently performed a contractual duty imposed by the CBA.  Plaintiff's memorandum in opposition to the motion to dismiss makes it clear that her claims are based instead on common law tort principles. For these reasons, the Court finds that Rawson is not controlling.[9]

The NFL raises a related argument that merits discussion.  Citing Rawson and Brown v. National Football League, 219 F. Supp. 2d 372 (S.D.N.Y. 2002), it argues that because the duty allegedly breached by the NFL "could run only to NFL players" and not to the general public, the negligence claim cannot be independent of the CBA.  In Rawson, in discussing the source of the duty that was allegedly breached, the Supreme Court noted in passing:

_____

[9] Another case cited by the NFL, Michigan Mutual Insurance Co. v. United Steelworkers of America, 774 F.2d 104 (6th Cir. 1985), is distinguishable for the same reasons.  Defendants also cite to Sherwin v. Indianapolis Colts, 752 F. Supp. 1172 (N.D.N.Y. 1990), and Smith v. Houston Oilers, Inc., 87 F.3d 717 (5th Cir. 1996), cases in which the courts found that tort claims brought by NFL players were preempted by § 301.  These cases, however, are also factually distinguishable because they were brought directly against the NFL clubs who were bound by the CBA.  Moreover, the rights asserted, and duties allegedly breached, were expressly created by the terms of the CBA.

> This is not a situation where the Union's delegates are accused of acting in a way that might violate the duty of reasonable care owed to every person in society. There is no allegation, for example, that members of the safety committee negligently caused damage to the structure of the mine, an act that could be unreasonable irrespective of who committed it and could foreseeably cause injury to any person who might be in the vicinity.

Rawson, 495 U.S. at 371. In Brown, the district court took this quote from Rawson one step further, stating, "[t]o be independent of the CBA, a tort claim must allege a violation of a duty 'owed to every person in society,' as opposed to a duty owed only to employees covered by the collective bargaining agreement." 219 F. Supp. 2d at 380 (quoting Rawson, 495 U.S. at 371).

The facts in Brown were as follows. Orlando Brown's pro-football career was brought to an end when an NFL referee negligently threw a weighted penalty flag, striking Brown in the eye. Brown filed suit against the NFL, alleging negligent hiring and training of the referee and alleging that the NFL was vicariously liable, as the referee's employer, for the referee's negligence. The NFL argued that the tort claims were preempted and that the arbitration clause of the CBA should be enforced. The court disagreed, finding that the duties allegedly breached by the NFL, i.e., the duty to use care in hiring and training employees, and by the referee, i.e., the duty to use care in throwing objects, were duties owed to all members of society, not just NFL football players. The court noted that similar claims could be brought against the NFL by any member of the general public who was injured in the same manner. Brown, 219 F. Supp. 2d at 380-81. The claims were therefore deemed to be independent of the collective bargaining agreement.

In this Court's view, the statement in Brown -- that "[t]o be independent of the CBA, a tort claim must allege a violation of a duty 'owed to every person in society,' as opposed to a

19

duty owed only to employees covered by the collective bargaining agreement" -- is too broad a reading of Rawson.  Contrary to the implication in Brown, the holding in Rawson was not dependent on a finding that the duty allegedly violated was owed only to the miners as opposed to "every person in society."  Instead, the Court found that the wrongful death claim was preempted because "[i]f the Union failed to perform a duty in connection with inspection, it was a duty arising out of the collective-bargaining agreement signed by the Union as the bargaining agent for the miners."  Rawson, 495 U.S. at 371.

In other words, the relevant inquiry for preemption purposes, under this prong of the test, is not to whom the duty is owed, but how it came into being.  Plaintiff, in this case, alleges that the NFL's duty came into being because it undertook, on its own initiative, to issue Hot Weather Guidelines to its member clubs to assist them in preventing and treating heat-related illness among their players.  According to Plaintiff, having voluntarily undertaken such a task, the NFL had a common law duty to exercise reasonable care. Under Plaintiff's theory of the case, it is the common law, not the CBA, that defines the source of the duty at issue.

For all of the reasons stated above, the Court concludes that Plaintiff's first claim for relief does not arise out of the CBA.  Therefore, in order to succeed on its preemption argument, the NFL must show that resolution of Plaintiff's wrongful death claim is substantially dependent on an analysis of the terms of the CBA or inextricably intertwined with it.  See DeCoe, 32 F.3d at 216.

### b.    Resolution of Plaintiff's Claim Requires Interpretation of the Terms of the CBA and Is Inextricably Intertwined With It

The NFL argues that even if the Court finds that Count 1 of Plaintiff's complaint does not arise out of the CBA, the claim is still preempted under the other prong of the DeCoe test.  The

Court agrees.

As noted earlier, a state-law tort claim may also be preempted if its resolution is "substantially dependent" on an analysis of the terms of the collective bargaining agreement. See Allis-Chalmers, 471 U.S. at 220. DeCoe provides a classic example of this concept. After being terminated for allegedly sexually harassing a co-worker, DeCoe filed suit against his former employer, asserting various state-law claims including defamation. The Sixth Circuit held that the defamation claim was preempted by § 301. One of the elements of a defamation claim is "an unprivileged publication to a third party." The CBA at issue in DeCoe imposed a duty on the employer to identify and resolve harassment claims, and subjected those claims to grievance and arbitration procedures. The Court found that the defamation claim was preempted because "it is difficult to understand how the plaintiff could establish that the challenged publications were unprivileged . . . without interpreting the CBA provisions that identified the duties imposed on all defendants." DeCoe, 32 F.3d at 217.

A tort claim may also be preempted if its resolution is "inextricably intertwined" with the terms of the CBA. The case of Holmes v. National Football League, 939 F. Supp. 517 (N.D. Tex. 1996), illustrates this concept. In Holmes, an NFL player who was suspended after testing positive for marijuana filed suit against the NFL and the NFLMC alleging numerous state-law tort claims, including fraudulent inducement, intentional infliction of emotional distress, breach of implied covenant of good faith and fair dealing, and invasion of privacy. Each claim was based on his belief that he had been misled into submitting to the drug test, which was a condition of employment. He claimed that defendants knowingly misrepresented that the drug test was being administered to check for use of steroids. Plaintiff argued that the true purpose of

21

the test was to check for use of marijuana, cocaine, and other controlled substances.  The court

found that Holmes' tort claims were preempted because their resolution was "inextricably

intertwined and substantially dependent" upon an analysis of the provision in the collective

bargaining agreement authorizing the team to conduct the drug test which prompted the claims.

Id. at 527.

      In applying these concepts to Plaintiff's wrongful death claim against the NFL, as set

forth in Count 1 of the complaint and fleshed out through briefs and oral argument, the Court

concludes that her claim is preempted because its resolution is "inextricably intertwined and

substantially dependent" upon an analysis of certain CBA provisions imposing duties on the

clubs with respect to medical care and treatment of NFL players.

      In order to succeed on her wrongful death claim, Plaintiff must establish that the NFL

owed Korey Stringer a duty, that the NFL breached that duty, and that the breach was a

proximate cause of Stringer's death.  See Stuedemann v. Nose, 713 N.W.2d 79, 83 (Minn. Ct.

App. 2006).  Plaintiff alleges that because the NFL gratuitously published Hot Weather

Guidelines as part of its 2001 Game Operations Manual, it owed a common law duty to exercise

reasonable care in making sure that those guidelines were complete and were in accordance with

the best practices established for minimizing the risk of heat-related illness and treating it when

it occurred.  Plaintiff further alleges that the NFL breached that duty of care, proximately

causing Stringer's death.  Plaintiff's claim is predicated on the theory that because the NFL

failed to use reasonable care in publishing the guidelines, the Vikings' athletic trainers, team

physicians, and other staff members were not adequately prepared to diagnose Stringer's

symptoms, or to treat him when he fell ill.

The question of whether the NFL was negligent in publishing the Hot Weather Guidelines in the 2001 Game Operations Manual is inextricably intertwined with certain key provisions of the CBA.  Minnesota courts have held that "[w]hile the standard of care remains constant, the degree of care varies with the facts and circumstances surrounding each particular case." Gordon v. Herzog, 410 N.W.2d 405, 408 (Minn. Ct. App. 1987) (quoting Connolly v. Nicollet Hotel, 95 N.W.2d 657, 664 (Minn. 1959)).  In other words, the degree of care owed cannot be considered in a vacuum.  The degree of care owed by the NFL in republishing the Hot Weather Guidelines as part of the 2001 Game Operations Manual, and what was reasonable under the circumstances, must be considered in light of pre-existing contractual duties imposed by the CBA on the individual NFL clubs concerning the general health and safety of the NFL players.

Two CBA provisions, in particular, are implicated.  First, the CBA requires that "full-time head trainers and assistant trainers be certified by the National Athletic Trainers Association." (CBA, Art. XLIV § 2).  Plaintiff's complaint alleges that "[a]thletic trainers in the NFL serve as the first line of treatment for players.  It is their initial responsibility to recognize and treat football-related injuries or conditions, including heat-related illness."  (Compl. ¶ 17).  According to Plaintiff, however, the Vikings' athletic trainers were not adequately prepared to recognize and treat Stringer's heat exhaustion and heatstroke.  Plaintiff seeks to impose liability for this shortcoming on the NFL.

In the Court's view, the degree of care owed by the NFL in republishing the Hot Weather Guidelines cannot be determined without first analyzing the significance of the CBA provision requiring athletic trainers to be certified by the National Athletic Trainers Association.  As part

23

of that certification process, the trainers may receive extensive instruction on how to prevent, recognize, and treat heat-related illness.  If, by virtue of the certification process, the trainers are fully prepared to handle heat-related illnesses, the degree of care owed by the NFL in publishing the Hot Weather Guidelines is diminished.  On the other hand, if, as part of the certification process, the trainers receive no instruction on how to prevent, recognize, and treat heat-related illnesses, the NFL's Hot Weather Guidelines obviously take on much greater significance, and the degree of care owed by the NFL increases considerably.  Resolution of Plaintiff's claim is therefore inextricably intertwined with this CBA provision.

The degree of care owed by the NFL in publishing the Hot Weather Guidelines must also be considered in light of the contractual duties imposed on the team physicians.  Plaintiff alleges that "[p]hysicians in the NFL serve as the primary care doctors for players and as supervisors and instructors for athletic trainers and also manage players' care and treatment for football-related injuries or conditions, including heat-related illness."  (Compl. ¶ 18).  The CBA requires the team physician to inform a player in writing if the player has a physical condition that will be "significantly aggravated by continued performance."  (CBA, Art. XLIV, § 1).  Heat exhaustion and heatstroke would certainly fall within this category.

The CBA places primary responsibility for identifying such physical conditions on the team physicians, who are presumably independently prepared, by virtue of their medical school training and experience, to recognize the signs of heat-related illness and to treat it, and need not rely on the content of the NFL's Hot Weather Guidelines.  This provision must, therefore, be taken into account in determining the degree of care owed by the NFL and what was reasonable under the circumstances.  For this reason, resolution of Plaintiff's wrongful death claim is also

inextricably intertwined with this contractual provision.

To the extent that Plaintiff is also relying on § 324A(a) and/or § 324A(c) of the Restatement (Second) of Torts, resolution of her claim is inextricably intertwined with these same provisions of the CBA.[10]  Section 324A(a) requires Plaintiff to establish, in addition to the traditional elements of negligence, that the NFL's publication of the Hot Weather Guidelines increased the risk of harm to Korey Stringer above and beyond what it would have been if the guidelines had not been issued at all.  Section 324A(c) requires Plaintiff to establish, in addition to the traditional elements of negligence, that Stringer died because the Vikings and their staff relied on the NFL's undertaking.  The relevant question, with respect to § 324A(c), is whether the NFL's publication of the Hot Weather Guidelines caused the Vikings' staff to forego other precautions.  See In re Norwest Bank Fire Cases, 410 N.W.2d 875, 880 (Minn. Ct. App. 1987) (citing Cracraft v. City of St. Louis Park, 279 N.W.2d 801, 807 (Minn. 1979) and § 324A(c)).

Again, these questions cannot be answered in a vacuum.  They must be considered in light of the contractual provision requiring the clubs to provide certified athletic trainers.  Without knowing whether the trainers are taught, as part of the certification process, to prevent, recognize, and treat heat-related illness, and without knowing the precise content of that training, it is impossible to determine whether the NFL's issuance of the Hot Weather Guidelines increased Stringer's risk of death, or caused the Vikings' athletic trainers to forgo other

---

[10]  To the extent that Plaintiff also relies on § 324A(b) of the Restatement (Second) of Torts, the parties disagree about whether Plaintiff must prove that the NFL "completely supplanted" duties owed by the Vikings to Stringer.  Since the Court has already found that Plaintiff's wrongful death claim is preempted because the question of the degree of care owed by the NFL is inextricably intertwined with certain provisions of the CBA, the Court need not resolve this particular dispute.

precautions.  If the trainers received no instruction on how to prevent and treat heat-related

illness, it is more likely that they relied on the Hot Weather Guidelines issued by the NFL.

However, if they received extensive training in that area, further inquiry would be required to

determine whether the NFL's guidelines were consistent with that training or contrary to it.

Therefore, to the extent that Plaintiff seeks recovery under §§ 324A(a) or (c), the Court finds that

resolution of Plaintiff's claim is substantially dependent on an analysis of this CBA provision.

 For the reasons stated above, the Court finds that although Plaintiff's wrongful death

claim against the NFL does not arise from the CBA, resolution of that claim is substantially

dependent on, and inextricably intertwined with, an analysis of certain provisions of the CBA.

The Court therefore concludes that Count 1 of Plaintiff's complaint is preempted by § 301 of the

LMRA, and the NFL is entitled to summary judgment in its favor.

### 2.   Count 4 (against NFL and NFL Properties)

 Plaintiff's fourth claim for relief, a negligence claim asserted against the NFL and NFL

Properties, alleges that:

> [t]he NFL had a duty to ensure that the equipment and materials it
> required players such as Korey Stringer to wear was of the highest
> possible quality and sufficient to protect the players from the risk
> of injury, including, but not limited to, the unnecessarily increased
> risk of heat-related illness...

and

> [a]s the licensing arm of the NFL, NFL Properties had a duty to
> ensure that the equipment and materials it licensed and approved
> was of the highest possible quality and sufficient to protect the
> players from the risk of injury, including, but not limited to, the
> unnecessarily increased risk of heat-related illness.

(Compl. at ¶¶ 66-67).  Plaintiff further alleges that the NFL Defendants breached these duties by

requiring, approving, and/or licensing the use of Riddell's helmets and shoulder pads, knowing

26

or having reason to know that these products increased the risk of heat-related illness. (Id.).

In its Supplemental Memorandum, the NFL argues that Plaintiff's claim is based on a faulty factual premise.  According to Tim Davey, Assistant Director of Game Operations for the NFL, the NFL does not <u>require</u> players to use Riddell equipment during training camps or games.  During games, players are simply required to wear shoulder pads "designed and produced by a professional manufacturer."  No particular manufacturer is specified.  (Davey Decl. ¶ 6).  Davey also denies that the NFL requires players to wear Riddell helmets during games.  The NFL simply prohibits players from wearing helmets displaying a visible identification of a manufacturer's name or logo unless the manufacturer has a "commercial arrangement" with the NFL.  (Id. at ¶7).  Plaintiff argues, however, that because Riddell is the only helmet manufacturer with a "commercial arrangement" with the NFL there is a *de facto* requirement that NFL players wear Riddell helmets.  In the Court's view, this factual dispute precludes summary judgment on this issue.

In any event, the question of whether the NFL mandates the use of Riddell equipment is largely irrelevant to the question of whether Plaintiff's claim is preempted by § 301 of the LMRA.  Plaintiff generally alleges that the NFL and NFL Properties breached their duty to ensure that the players had safe equipment.  For preemption purposes, the only relevant questions are whether this claim arose out of the CBA and, if not, whether its resolution is substantially dependent on an interpretation of any provisions of the CBA.

Plaintiff's claim does not arise out of the CBA.  Neither the NFL nor NFL Properties is a party to the CBA.  While both NFL Defendants are mentioned in the CBA, the CBA imposes no duty on either of them to ensure that the equipment used by NFL players adequately protects

from risk of injury or illness. Any such duty, if it exists, clearly has its source in the common law.

Nor is resolution of Count 4 substantially dependent on an interpretation of any of the terms of the CBA, which is largely silent on the topic of equipment safety. As discussed earlier, although the CBA creates a "Joint Committee on Player Safety and Welfare . . . for the purpose of discussing the player safety and welfare aspects of playing equipment," (CBA, Art. XIII, § 1(a)), the NFL Defendants are not members of that committee and are not required to adopt the committee's recommendations. In short, there is no need to interpret that provision, or any other, to determine whether the NFL Defendants owed Korey Stringer a duty to ensure that he had safe equipment, whether they breached that duty, or whether the alleged breach proximately caused his death. The Court therefore concludes that Count 4 of Plaintiff's complaint is not preempted.

### C. Applicability of Arbitration Clause

As an alternative ground for dismissal of Plaintiff's claims against them, the NFL Defendants argue that those claims must be dismissed because Plaintiff failed to submit them to arbitration as required by the CBA. The arbitration clause at issue provides, in relevant part:

> Any dispute ... arising after the execution of this Agreement and involving the interpretation of, application of, or compliance with, any provision of this Agreement, the NFL Player Contract, or any applicable provision of the NFL Constitution and Bylaws pertaining to terms and conditions of employment of NFL players, will be resolved exclusively in accordance with the procedure set forth in this Article.

(CBA, Article IX, § 1).

Plaintiff argues that because she is not a signatory to the CBA, she is not bound by this

28

arbitration requirement.  She notes that the CBA purports to bind only the "heirs, executors, administrators, representatives, agents, successors and assigns" of "the Parties" to the agreement. (CBA, Article LV, § 14).  The only "parties" to the agreement are the NFLPA and the NFLMC. She contends that since she is not an "heir" to the NFLPA or the NFLMC, she is not bound by the arbitration clause.  She also contends that she is not bound by the arbitration provision since the CBA specifies that grievances may be initiated only by "a player, a Club, the Management Council, or the NFLPA."  (CBA, Article IX, §2).

The Court need not address this alternate ground for dismissal with respect to Count 1 of Plaintiff's complaint; the Court has already determined that dismissal of that claim is warranted because it is preempted by § 301 of the LMRA.  Moreover, in holding that Count 4 of Plaintiff's complaint is not preempted by § 301, the Court implicitly found that the dispute does not involve "interpretation of, application of, or compliance with" any provision of the CBA.  Therefore, Count 4 of Plaintiff's complaint clearly falls outside the scope of the subject matter of this arbitration clause and there is no need to separately address the issue of whether Plaintiff, as a non-signatory to the CBA, is bound by it.

**V.     Riddell Defendants' Motion for Judgment on the Pleadings (Count 3)**

In Count 3 of her complaint, Plaintiff asserts claims of negligence, strict products liability, breach of express or implied warranty, and failure to warn.  (Compl. ¶ 52).  These claims, brought against the Riddell Defendants, are based on Plaintiff's belief that Riddell's helmets and shoulder pads are unreasonably dangerous and not fit for their intended use.  The Riddell Defendants have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  Like the NFL Defendants, they argue that Plaintiff's claims

are preempted by § 301 of the LMRA.

### A. Standard

In their motion for judgment on the pleadings, the Riddell Defendants also rely heavily

on the CBA, which was submitted outside the pleadings.  As with motions to dismiss under Rule

12(b)(6), "[i]f, on a motion for judgment on the pleadings, matters outside the pleadings are

presented to and not excluded by the court, the motion shall be treated as one for summary

judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable

opportunity to present all material made pertinent to such a motion by Rule 56."  Fed. R. Civ. P.

12(c).

As discussed above, ordinarily a court must give the opposing party notice prior to

converting a motion to a motion for summary judgment.  Ball, 385 F.3d at 719.  However, where

both parties rely on matters outside the pleadings, neither party will be surprised or prejudiced

by the conversion to a Rule 56 motion.  See Williams v. Wilkinson, 122 F. Supp. 2d 894, 897

(S.D. Ohio 2000); Rowe v. Marietta Corp., 955 F. Supp. 836, 837 (W.D. Tenn. 1997).  Plaintiff

has responded to the Riddell Defendants' motion and has also submitted materials outside the

pleadings.  Therefore, this Court will treat the Riddell Defendants' motion for judgment on the

pleadings as a motion for summary judgment.

### B. Preemption Analysis

As discussed above, to determine whether a state-law tort claim is sufficiently

"independent" to survive § 301 preemption, the Court must determine whether the right claimed

by Plaintiff is created by the CBA or by state law and, if it is created by state law, whether proof

of the state-law claim is substantially dependent on an analysis of the terms of the CBA or

inextricably intertwined with it.  See DeCoe, 32 F.3d at 216.  The parties agree that Plaintiff's claims against the Riddell Defendants do not arise from the CBA.  The Riddell Defendants are not parties to the CBA, and the CBA imposes no duty on them to provide safe equipment.  Therefore, Plaintiff's claims against the Riddell Defendants are preempted only if their resolution is substantially dependent on an analysis of the terms of the CBA or inextricably intertwined with it.

The Riddell Defendants point out that the CBA establishes a Joint Committee to address issues of player safety, including the safety of equipment.  This, however, is not enough.  The question is not whether Plaintiff's claim relates to subject matter contemplated in the CBA but whether resolution of the claim requires an interpretation of the terms of the CBA.  See Kline v. Security Guards, 386 F.3d 246, 256 (3d Cir. 2004).  While the Joint Committee may be charged with discussing the safety of equipment, resolution of Plaintiff's product liability and negligence claims against the Riddell Defendants is not in any way dependent on an interpretation of the meaning of this CBA provision.

In their motion for judgment on the pleadings, the Riddell Defendants concede that, standing alone, Plaintiff's claims against them would not be preempted.  They argue, however, that when viewed in the context of Plaintiff's allegations that use of the Riddell equipment was "league-mandated," and in combination with Plaintiff's claim for injunctive relief against all Defendants, these claims must be considered preempted.  Neither argument has merit.  As Plaintiff correctly points out, in order to recover on her claims against the Riddell Defendants, she does not need to show why Korey Stringer was wearing Riddell equipment.  The fact that he may have been required, as a condition of his employment, to wear Riddell equipment is simply

irrelevant to the question of whether that equipment was negligently designed or manufactured or unreasonably dangerous for its intended use.  Moreover, as noted earlier, after the motion for judgment on the pleadings was filed, Plaintiff voluntarily dismissed her claim for injunctive relief, rendering moot the Riddell Defendants' other argument.

In their reply brief, the Riddell Defendants argue, for the first time, that, with respect to the defective design claim, Plaintiff must prove that the "foreseeable risks associated with the design" of the equipment exceeded the benefits associated with that design.  See Ohio Revised Code § 2307.75(A).  Defendants contend that in order to determine the "foreseeable risks," the Court will have to determine under what conditions the equipment will be used.  According to Defendants, this will require the Court to examine and interpret the CBA's requirements that players report to training camp and participate fully, undergo pre-season physical examinations, and be in excellent physical condition. (CBA, Articles XXXVII and XLIV, § 5; Appendix C, NFL Player Contract at ¶ 8).

As an initial matter, Defendants' citation to the Ohio Revised Code is inapposite because Minnesota law, rather than Ohio law, governs Plaintiff's tort claims.  Under Minnesota law, a product designer must exercise a degree of care "so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended." Bilotta v. Kelley Co., 346 N.W.2d 616, 621 (Minn. 1984) (quoting Holm v. Sponco, 324 N.W.2d 207, 212 (Minn. 1982)).  In applying the Minnesota standard rather than Ohio law, Defendants would presumably argue that, in determining the manner in which the football helmets and shoulder pads are intended to be used, the trier of fact would need to consider that the equipment would be worn during training camp, which generally

32

takes place in hot weather.  The trier of fact might also want to consider that the equipment would be worn by athletes who were required to be in excellent physical condition and had passed a pre-season physical examination.

While these facts may be somewhat relevant to Plaintiff's design defect claim, resolution of that claim is not substantially dependent on an interpretation of any of the CBA provisions cited by Defendants.  The meaning of the CBA provisions that require the players to participate fully in training camp, undergo physical examinations, and be in excellent physical condition is not in dispute; therefore, the simple fact that the CBA might be consulted in resolving the design defect claim does not require preemption.  Livadas, 512 U.S. at 124.  These particular CBA provisions are tangential, at best, to Plaintiff's design defect claim.

For the reasons set forth above, the Court concludes that the claims set forth in Plaintiff's third claim for relief are not preempted by § 301 of the LMRA.  The Court therefore denies the Riddell Defendants' motion for judgment on the pleadings.

## VI.     Conclusion

The NFL Defendants' motion to dismiss or, in the alternative, for summary judgment (Record at 7) is **GRANTED IN PART and DENIED IN PART**.  The Court **GRANTS** summary judgment in favor of the NFL on Count 1 of Plaintiff's complaint because that claim is preempted by § 301 of the LMRA.  Count 4 of the complaint, however, is not subject to dismissal on grounds of preemption.  Nor is arbitration of that claim required.

The Riddell Defendants' motion for judgment on the pleadings with respect to Count 3 of the complaint (Record at 20), which the Court is treating as a motion for summary judgment, is **DENIED**.

Plaintiff may, therefore, proceed with Counts 3 and 4 of her complaint.[11]

**IT IS SO ORDERED.**


Date: February 1, 2007                    **/s/ John D. Holschuh**
                                          John D. Holschuh, Judge
                                          United States District Court

---

[11]  Nothing in this opinion should be construed as indicative of the Court's views concerning the ultimate merits of these claims.

34