# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

KELCI STRINGER,                          :

      Plaintiff,                          :          Case No. 2:03-cv-665

      v.                          :          Judge Holschuh

NATIONAL FOOTBALL LEAGUE,                :          Magistrate Judge Abel
et al.,
                                         :

      Defendants.                          :

                                         :

## MEMORANDUM OPINION AND ORDER

Korey Stringer ("Stringer"), a football player for the Minnesota Vikings ("Vikings"), suffered a heat stroke and died during the Vikings' July 2001 training camp. Plaintiff Kelci Stringer ("Plaintiff"), Stringer's wife and the executor of his estate, brings this wrongful death/survivorship action against, among others, the All American Sports Corporation and Riddell, Inc. (collectively, "Defendants"), and alleges that Defendants' helmets and shoulder pads are defective and caused Stringer's death. This matter is currently before the court on Defendants' Motion for Summary Judgment. (Doc. # 53.) For the following reasons, Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.     Background

Stringer, an offensive lineman for the Vikings, reported to the Vikings training camp in Mankato, Minnesota on July 29, 2001. Conditions at the training camp were extremely hot and humid, and were potentially dangerous to anyone who was not acclimated to exercising in the heat. (Dep. of Walter Lyons p. 29, doc. # 56.) Stringer had a history of showing up to training camp in poor physical condition, and even though he arrived to the 2001 training camp in better condition

than he had in previous years he still weighed approximately 340 lbs and was not acclimated to exercising in the heat. (Dep. of Mike Tice pp. 47, 85-6, doc. # 54.)

Training camp practice began on July 30. During both the morning and afternoon practices on July 30 the players, including Stringer, wore "shells," which consisted of a helmet, shoulder pads, shorts and a jersey, in addition to shoes, socks, and undergarments. The helmet and shoulder pads that Stringer wore were manufactured by Defendants, and were constructed out of thick, dense padding to protect against the impacts players experienced during football practices and games. Although both the helmet and shoulder pads contained warnings against misuse, neither contained any warning about a risk of suffering a heat stroke or other heat-related illness. Stringer participated in the morning practice without incident, although he complained to coaches and trainers of an upset stomach. (Id. p. 110.)

During the afternoon practice, however, Stringer suffered an episode of heat exhaustion. Stringer continued to complain about his stomach, and fellow players and coaches observed Stringer vomiting during drills. (Dep. of Matthew Birk p. 48, doc. # 57; Tice Dep. pp. 122-25.) Stringer's performance was described as "sluggish" and "struggling;" "[h]e was slow getting back to the line when he finished his repetitions and individual drills. He was not talkative, which he normally was; he was quiet. [He] had a look of anguish on his face." (Tice Dep. p. 124.) When Stringer continued to vomit, coaches called for a trainer and removed Stringer from practice over Stringer's objections. The trainers took Stringer to an air conditioned trailer to cool down and gave him water, but did not give him any other first aid. (Dep. of Charles Barta p. 46, 47, doc. # 55.)

Training camp continued on July 31 with a morning practice. During this practice the players wore full pads instead of shells, i.e. football pants with knee, thigh, and hip pads instead of

shorts, along with a helmet, shoulder pads, jersey, shoes, socks, and undergarments. Just as on July 30, the helmet and shoulder pads Stringer wore were manufactured by Defendants. Stringer continued to complain of stomach problems before the practice but trainers, after simply weighing him and determining that he had gained back the fluid weight he lost the previous day, cleared him to return to practice with the direction to continue drinking fluids. (Barta Dep. p. 259-60.) Stringer practiced well and his coaches did not observe him struggling with the heat (Tice Dep. 183-84), but at approximately 11:00 a.m. during a set of extra drills after the formal practice had ended Stringer collapsed on the practice field. (Dep. of Billy McFarland p. 46, doc. # 90-2.) He told his teammates that he needed a trainer (Birk Dep. 79), and once the trainers arrived Stringer got up and walked with them to the air conditioned trailer. (Dep. of Paul Osterman p. 40, doc. # 66.)

Inside the trailer the trainers allowed Stringer to rest and cool off and gave him water, but did not give him any other aid, assess his condition, or otherwise suspect that Stringer was in danger of or was suffering a heat related illness. (Id. p. 65.) Stringer did not speak to or interact with the trainers except to thank them for removing his shoes, socks, and athletic tape (id. p. 48-57), but he moved back and forth from a training table to the floor several times and was detached and distant. These are symptoms of heat stroke, but were not recognized by the trainers. After approximately 30 minutes in the trailer Stringer laid down on the floor and became unresponsive, and the trainers began to suspect that something was wrong. (Id. p. 70-72.) Stringer was still sweating after 30 minutes inside an air conditioned trailer, and his skin felt cool and moist (id. p. 79), both of which are symptoms of heat stroke. The trainers called for a medical advisor who arrived and initially believed that Stringer was hyperventilating, and consequently told one of the trainers to hold a plastic bag over Stringer's mouth. When Stringer did not respond to this treatment the trainers,

although still not knowing what was wrong with Stringer, called for an ambulance at approximately 12:00 p.m. to take Stringer to the emergency room. (Dep. of Fred Zamberletti p. 67-69, doc. # 63.) At no point did anyone attempt to cool Stringer or realize that he was suffering from heat stroke.

Stringer arrived at the hospital at approximately 12:30 p.m. By this time he was comatose and his pulse was rapid. His temperature was taken for the first time since he collapsed, and it registered as 108.8° F. a full hour and a half after Stringer had stopped exercising. Stringer was admitted to the hospital and received treatment, but died at approximately 1:30 a.m. on August 1, 2001 due to multi-organ failure and complications from exertional heat stroke.

Plaintiff sued the National Football League, NFL Properties, Inc., Dr. John Lombardo (the "NFL Defendants"), and Defendants on July 28, 2003. (Compl., doc. # 1.) Plaintiff brought negligence claims against the NFL Defendants and alleged that they breached a duty of care to Stringer by failing to provide complete, current and competent information and directions to NFL athletic trainers, physicians and coaches regarding heat-related illness and its prevention, symptoms and treatment. (Id. ¶¶ 29-43.) Plaintiff brought products liability claims against Defendants based on both design defect and failure to warn theories, as well as breach of warranty claims. Plaintiff alleged that Defendants' helmets and shoulder pads were defectively designed and/or manufactured because they act as an insulating blanket preventing evaporation and heat dissipation. According to Plaintiff, this unreasonably increases a player's body temperature and was a substantial contributing factor to Stringer suffering a heat stroke. Additionally, Plaintiff alleges that Defendants breached a duty to warn of this danger by not including any heat-related illness warning on either the helmet or shoulder pads, and that Defendants breached implied and express warranties. (Id. ¶¶ 44-64.)

Both the NFL Defendants and Defendants initially argued that Plaintiff's claims were preempted by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and filed motions to dismiss on that ground. (Doc. ## 7, 20.) The court, in a Memorandum Opinion and Order dated February 1, 2007, denied Defendants' motion in full and granted in part and denied in part the NFL Defendants' motion, see <u>Stringer v. National Football League et al.</u>, 474 F.Supp.2d 894 (S.D. Ohio 2007), and the case proceeded to discovery. After a sufficient period of discovery, Defendants filed a Motion for Summary Judgment on October 30, 2008. (Doc. # 53.) Plaintiff responded on December 24, 2008 (doc. # 80), and Defendants replied on January 19, 2009 (doc. # 84). Defendants' Motion is now ripe for adjudication. Plaintiff and the NFL Defendants, however, stipulated to the dismissal with prejudice of Plaintiff's claims against the NFL Defendants on January 21, 2009. (Doc. # 89.) The court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

## II.     Summary Judgment Standard

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986) (<u>quoting</u> FED. R. CIV. P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c). Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right to trial by jury if they really have issues to try." <u>Poller v. Columbia Broadcasting Sys.</u>, 368 U.S. 464,

467 (1962) (quoting <u>Sartor v. Arkansas Natural Gas Corp.</u>, 321 U.S. 620, 627 (1944)). <u>See also</u> <u>Lansing Dairy, Inc. v. Espy</u>, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. <u>Lashlee v. Sumner</u>, 570 F.2d 107, 111 (6th Cir. 1978). The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); <u>Weaver v. Shadoan</u>, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. <u>Leary v. Daeschner</u>, 349 F.3d 888, 897 (6th Cir. 2003). All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986); <u>Wade v. Knoxville Util. Bd.</u>, 259 F.3d 452, 460 (6th Cir. 2001). Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson</u>, 477 U.S. at 247-48 (emphasis in original). A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application

of [an] appropriate principle of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984). See also Anderson, 477 U.S. at 248. An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. See also Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. The nonmoving party must demonstrate that "there is a genuine issue for trial," and "cannot rest on her pleadings." Hall v. Tollett, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

FED. R. CIV. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. Anderson, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993). The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. Anderson, 477 U.S. at 251-52; Lansing Dairy, Inc., 39 F.3d at 1347.

### III.    Analysis

Plaintiff brings products liability claims, based on failure to warn and design defect theories, and implied and express warranty claims against Defendants.[1]  Minnesota law governs the substance of these claims.  Because this court's jurisdiction is premised on diversity of citizenship pursuant to 28 U.S.C. § 1332, the court must apply Ohio's choice of law rules, see Klaxon Co. v. Stento Elec. Mfg. Co., 313 U.S. 487, 496 (1941), and Ohio has adopted the Restatement (Second) of Conflict of Laws to govern the question of what law to apply in tort actions, see Morgan v. Biro Manufacturing, 15 Ohio St. 3d 339, 342, 474 N.E.2d 286 (1984).  Section 175 of the Restatement governs actions for wrongful death, and states that "the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship . . . to the occurrence and the parties, in which event the local law of the other state will be applied."  In this case, Minnesota is the state where the injury occurred and there is no evidence that any other state has a significant relationship to the occurrence or the parties.

### A.    Failure to Warn Claim

To establish a products liability failure to warn claim under Minnesota law, a plaintiff must show 1) that the manufacturer had a duty to warn of the dangerous nature of the product; 2) a breach of that duty; and 3) that the lack of a warning caused the relevant injury.  See Tuttle v. Lorillard Tobacco Co., 377 F.3d 917, 924 (8th Cir. 2004) (applying Minnesota law).  The parties dispute the

---

[1] Under Minnesota law, a cause of action for failure to warn is separate from a cause of action for defective product design.  See Bilotta v. Kelley Co., Inc., 346 N.W.2d 616, 626 (Minn. 1984) (Simonett, J., concurring).  These claims, although applying some negligence principles, are strict liability claims.  McCormack v. Hankscraft Co., 154 N.W.2d 488, 501 (Minn. 1967).

first and third elements.[2]

## 1. Duty to Warn

The question of whether a duty to warn exists is a question of law for the court to decide.

Germann v. F.L. Smithe Mach. Co., 395 N.W.2d 922, 924 (Minn. 1986). This question hinges on

whether the injury was reasonably foreseeable to the manufacturer. Balder v. Haley, 399 N.W.2d

77, 81 (Minn. 1987).

> In determining whether the duty exists, the court goes to the event causing the
> damage and looks back to the alleged negligent act. If the connection is too remote
> to impose liability as a matter of public policy, the courts the hold there is no duty,
> and consequently no liability. On the other hand, if the consequence is direct and is
> the type of occurrence that was or should have been reasonably foreseeable, the
> courts then hold as a matter of law a duty exists.

Germann, 395 N.W.2d at 924. There is, however, no duty to warn of dangers if they are obvious.

Westerberg v. Sch. Dist. No. 792, Todd Cty., 276 Minn. 1, 10, 148 N.W.2d 312 (1967).

Defendants argue that they had no duty to warn because the danger presented by the helmet

and shoulder pads was obvious. Defendants point out that a fundamental characteristic of football

helmets and shoulder pads is that they are made of thick, durable materials that protect the body

from impact, and that it is common knowledge that wearing heavy materials will trap heat. Thus,

according to Defendants, it is obvious that wearing a helmet and shoulder pads will make a wearer

hotter, negating any duty on their part to warn of risks associated with wearing the helmet and

shoulder pads and practicing in hot conditions. (Def. Mot. Summ. J. pp. 17-19, doc. # 53.) Plaintiff

counters by arguing that the "event causing the damage," see Germann, 395 N.W.2d at 924, i.e.

---

[2] There is no dispute as to the second element because, assuming that Defendants had a
duty to warn, they unquestionably breached that duty by providing no heat-related illness
warning at all. On the other hand, if Defendants did not have a duty to warn, there could be no
breach of duty.

Stringer's heat stroke, must have been obvious, not the general risk of becoming hotter when wearing a helmet and shoulder pads. Plaintiff argues that there no indication that Stringer, his coaches, or his trainers were aware of this risk, that it was not obvious, and that Defendants had a duty to warn of this risk. (Pl. Resp. pp. 35-38, doc. # 80.)

The court agrees with Plaintiff that, under Minnesota law, the specific risk of developing heat stroke, not a more general risk of becoming hotter while wearing a helmet and shoulder pads, must have been apparent in order to make the danger obvious. In <u>Indep. Sch. Dist. No. 14 v. AMPRO Corp.</u>, 361 N.W.2d 138 (Minn. Ct. App. 1985), two students wanting to "make a little smoke" set fire to an athletic mat stored in a high school's gymnasium. The mat, once on fire, burned extremely rapidly, gave off intense heat, and emitted a considerable amount of dense, black smoke that caused extensive damage to the school building. The school district, in addition to suing the students, brought a products liability claim against the mat's manufacturers and alleged that the mat was unreasonably dangerous and that the manufacturers had failed to warn of the mat's propensity for unusually rapid burning and excessive smoke production. <u>Id.</u> at 141.

The manufacturers argued that they had no duty to warn because it was obvious that an athletic mat can burn when exposed to flame. After the trial court granted the manufacturers' motion for a directed verdict on this issue, the Minnesota Court of Appeals reversed and held that the danger was not obvious:

> [Manufacturers], however, fail to distinguish ordinary burning from the hot, rapid, smoky burning of which [the school district] presented evidence. This is a different, more serious, and more unexpected danger than that posed by ordinary flammable items. Such a danger is not obvious, and while [the school district] admitted knowing that [the mats] might burn, it indicated no knowledge of the speed or intensity with which they burned.

<u>Id.</u> at 143. The court of appeals remanded the case for submission to a jury.

The Eighth Circuit Court of Appeals applied Indep. Sch. Dist. No. 14 in Gamradt v. Federal Laboratories, Inc., 380 F.3d 416 (8th Cir. 2004) (applying Minnesota law). In that case, a prison guard was injured during a training exercise by a smoke grenade when the grenade was accidentally detonated in a confined stairwell. After inhaling the smoke in the enclosed area, the plaintiff suffered from long-term shortness of breath and coughing, and permanently lost 60% of his aerobic lung capacity. He filed suit against the grenade's manufacturers and alleged that they "failed to warn of the dangers associated with activating a black smoke grenade in an enclosed area." Id. at 418. Although the manufacturers did not raise the issue, the district court sua sponte found that the dangers associated with the smoke grenade were obvious, and granted the manufacturers' motion for summary judgment.

The Eighth Circuit reversed. Relying on the reasoning in Indep. Sch. Dist. No. 14, the court found that

> [k]nowledge of the general danger associated with minor smoke inhalation is not enough to relieve the manufacturer of its duty to warn about foreseeable dangers associated with indoor use of a black smoke grenade. . . . The specific risk of permanent respiratory damage posed by using the black smoke grenade indoors must have been obvious to the user. . . . In this case, while it may be obvious that a black smoke grenade may emit an opaque gas, and it may be obvious that the substance could cause minor discomforts, we do not think it is obvious that a person could permanently lose 60% of his aerobic capacity as a result of being exposed to a black smoke grenade that was detonated indoors. . . . Quite obviously, the dangers posed by activating a black smoke grenade indoors are "different, more serious, and more unexpected" than the general dangers of detonating a black smoke grenade outdoors.

Id. at 420-21 (internal citations and paragraph breaks omitted). The Eighth Circuit remanded the case to the district court for trial.

The court reaches the same result in this case. While it is indeed common knowledge that wearing thick, dense items such as a football helmet and shoulder pads will make the wearer hotter,

this general knowledge is different from the more specific knowledge that wearing such items during extremely hot and humid conditions and while engaged in strenuous exercise can cause the wearer to suffer heat exhaustion and heat stroke. Heat exhaustion and heat stroke pose a "different, more serious, and more unexpected" danger than any general danger that would have been obvious to Stringer. Although Defendants argue that Stringer was an experienced football player and sophisticated user of the helmet and shoulder pads to whom this danger should have been obvious (Def. Mot. Summ. J. pp. 19-20, doc. # 53), "[p]ast experience with a product . . . does not necessarily alert users to all of the dangers associated with the product." Willmar Poultry Co. v. Carus Chemical Co., 378 N.W.2d 830, 835 (Minn. Ct. App. 1985). There is no evidence in the record that Stringer had any knowledge of the heightened risk of developing heat stroke, as opposed to the general risk of becoming hotter, associated with wearing Defendants' helmet and shoulder pads in the extremely hot and humid conditions of the Vikings' training camp. Additionally, the question of whether a user's knowledge of the risks posed by a product will excuse the manufacturer's duty to warn is generally a question of fact that is not properly resolved on summary judgment. Id. The court concludes that the risk was not obvious.

Furthermore, under the Germann test quoted above, Defendants had a duty to warn of this risk. The connection between Stringer's heat stroke and Defendants' failure to warn is not so remote as to relieve Defendants of liability as a matter of law, and a player suffering a heat stroke while wearing Defendants' helmet and shoulder pads should have been reasonably foreseeable to Defendants. Medical research nearly 50 years old has recognized a potential link between wearing football equipment and heat-related illnesses (Exs. 2, 3 to Dep. of Lawrence Armstrong, doc. # 82), and Defendants have received letters from product designers warning of the risks of users

12

developing heat strokes as a result of wearing Defendants' helmets and shoulder pads (Mark Monica Letter, Ex. 6 to Dep. of Lawrence Armstrong, doc. # 82). Plaintiff has also offered expert testimony opining that Defendants' helmet and shoulder pads were substantial contributing factors in Stringer suffering a heat stroke. (Pl. Resp. pp. 22-25, doc. # 80). Although Defendants argue that this testimony does not establish a connection between their products and Stringer's heat stroke and thus "the connection between the lack of a warning . . . and Stringer's heat stroke is too remote to impose liability as a matter of law" (Def. Mot. Summ. J. p. 32 n. 7, doc. # 53), the court finds that Plaintiff's expert testimony is sufficient to create a genuine dispute as to this issue. The connection between Defendants' products and Stringer's heat stroke is not too remote to relieve Defendants of liability as a matter of law.

Defendants have in fact recognized that other risks of injury, such as the risks surrounding players using the helmet to "spear" or ram into other players and the general risks of impact injuries associated with playing football, are reasonably foreseeable, and have included warnings about those risks on the helmet and shoulder pads. The same should hold true for other reasonably foreseeable risks of injury. It was reasonably foreseeable to Defendants that a user of their helmets and shoulder pads during extremely hot and humid conditions might suffer from a heat stroke, and the court thus concludes that Defendants owed Stringer a duty to warn.

Defendants offer another defense, and argue that they had no duty to warn the end users of their products, such as Stringer, because the Vikings trainers and coaches were sophisticated intermediaries. (Def. Mot. Summ. J. pp. 26-28, doc. # 53.)

> Under the sophisticated intermediary defense, some courts have held that a product supplier has no duty to warn the ultimate user where either of two situations is present: (1) the end user's employer already has a full range of knowledge of the dangers, equal to that of the supplier or (2) the supplier makes the employer

> knowledgeable by providing adequate warnings and safety instructions to the employer. . . . [T]he sophisticated intermediary defense is generally only available where the supplier can show that it used reasonable care in relying upon the intermediary to give the warning to the end user.

Gray v. Badger Mining Corp., 676 N.W.2d 268, 277-78 (Minn. 2004). The sophisticated intermediary defense does not technically discharge the duty to warn; rather, it focuses on the conduct that the manufacturer/supplier undertook to discharge that duty, and asks whether that conduct was reasonable in light of the circumstances. The applicability of the sophisticated intermediary defense is usually a question of fact best left to the jury. See id. at 279-80 (in action by foundry worker injured by silica dust against silica supplier, supplier's sophisticated intermediary defense and reasonable reliance on foundry to impart proper warnings presented genuine issues of material fact that precluded summary judgment for supplier).

In this case, genuine factual issues exist as to the reasonableness of Defendants' reliance on the Vikings organization to give appropriate warnings to its players. Defendants argue that the evidence is "overwhelming" that the Vikings trainers and coaches were aware of and knew how to address the risk of heat illnesses (Def. Mot. Summ. J. p. 37, doc. # 53) and there is some evidence tending to support this argument. However, there is also evidence, such as the Vikings trainers' response to and treatment of Stringer's heat stroke, that suggests that the Vikings trainers were not sophisticated intermediaries, that they did not have the specialized knowledge required to properly address the risks, and that Defendants' reliance on them to discharge the duty to warn was unreasonable. Questions of reasonableness and reasonable reliance are jury questions, and are not properly resolved by the court on summary judgment. See, e.g., Niemi v. NKH Spring Co., Ltd. 543 F3d 294, 303 (6th Cir. 2008); Gray, 676 N.W.2d at 280. Whether the sophisticated intermediary defense applies in this case is best left to the jury to decide.

### 2.     Causation

To establish causation in a failure to warn claim, Plaintiff must show that had a warning been given, the injury would not have occurred.  This requires Plaintiff to present "some admissible evidence [that Stringer or the Vikings] would have acted differently had the manufacturers provided adequate warnings."[3] Tuttle, 377 F.3d at 924.  Questions of causation are generally reserved for the jury.  Lubbers v. Anderson, 539 N.W.2d 398, 402 (Minn. 1995).  "It is only where the evidence is so clear and conclusive as to leave no room for differences of opinion among reasonable men that the issue of causation becomes one of law to be decided by the court."  Vanderweyst v. Langford, 228 N.W.2d 271, 272 (Minn. 1975).

Defendants offer two arguments as to why there is no genuine issue on causation.  First, Defendants argue that there is no evidence tending to show that Stringer would have refused to practice or otherwise changed his own behavior in response to a warning.  Second, Defendants argue that there is no evidence that a warning would have changed the actions of the Vikings' trainers and staff.  (Def. Mot. Summ. J. pp. 33-34, doc. # 53.)  Plaintiff responds by arguing that a jury could reasonably infer that Stringer would have followed a warning, and that the Vikings' trainers' response to Stringer's condition illustrates that a warning could have altered their behavior and prevented Stringer's heat stroke.  (Pl. Resp. pp. 43-45, doc. # 80.)

### a.     Whether a Warning Would Have Changed Stringer's Conduct

---

[3] When addressing this element of Plaintiff's failure to warn claim, both parties devote a substantial portion of their arguments to discussing whether or not the helmet and shoulder pads actually caused Stringer's heat stroke.  (Def. Mot. Summ. J. pp. 20-23, doc. # 53; Pl. Resp. pp. 40-43, doc. # 80.)  Those kinds of causation arguments, however, are more relevant to Plaintiff's design defect claim, not the failure to warn claim.  Causation in the failure to warn context is concerned with whether a warning would have prevented the injury suffered by altering the product user's conduct.  See 27 Minn. Prac., Products Liability Law § 4.11 (2008).

As to the first argument, the court agrees with Defendants. Defendants point out that there is no affirmative evidence showing that Stringer would have done anything differently during the July 31 practice if he had been warned of the possible dangers of suffering a heat stroke. Stringer was required to wear the helmet and shoulder pads during practice, and although one of Plaintiff's experts testified that a warning might have prompted Stringer to remove his helmet between drills, Defendants point out that video of the July 31 practice, as well as the testimony of Stringer's coaches and teammates, establish that Stringer removed his helmet between drills even without a warning. (Def. Mot. Summ. J. p. 24, doc. # 53.) Defendants also point out that there is no evidence that Stringer would not have practiced on July 31 if Defendants' products contained a warning: the Vikings required Stringer to participate in training camp and Stringer had resisted his coaches' and trainers' efforts to remove him from practice the day before. (Id.)

Plaintiff's response is to note that, despite his reluctance, Stringer did in fact leave practice on July 30 when directed to do so by his coaches and trainers. Plaintiff also notes that Defendants' in-house counsel testified that Defendants intend that users of their products would comply with given warnings. Plaintiff then argues that, based on these two facts, a reasonable jury could infer that Stringer would not have practiced on July 31 had Defendants included heat-related warnings with the helmet and shoulder pads. (Pl. Resp. pp. 43-44, doc. # 80.)

Although inferences drawn from facts must be considered in the light most favorable to the nonmoving party on summary judgment, see Matsushita Elec. Indus. Co., 475 U.S. at 587-88, Plaintiff's argument is not tenable. The fact that Stringer left practice on July 30, reluctantly and only at the express direction of his coaches and trainers, does not support an inference that he would have outright refused to practice on July 31, in direct contravention of the demands of his coaches

and the Vikings organization that required him to participate in training camp practices, if he had read a warning about the possibility of suffering a heat-related illness while wearing Defendants' products. The fact that Defendants intended that product users comply with given warnings does not say anything about what Stringer would have actually done in response to a given warning.

Plaintiff, in effect, is asking the court to find that a presumption exists that, as a matter of law, Stringer would have heeded a warning, not practiced on July 31, and thus not suffered a heat stroke. Some jurisdictions do recognize a rebuttable presumption that a product user will read and heed a warning, and when no warning is given the practical effect of this presumption is to relieve a plaintiff of the burden of proof on the issue of causation. See Boerner v. Brown & Williamson Tobacco Corp., 260 F.3d 837, 842-45 (8th Cir. 2001) (collecting cases). Minnesota, however, has not adopted this presumption, see Tuttle, 377 F.3d at 925; Kallio v. Ford Motor Co., 407 N.W.2d 92, 99-100 (Minn. 1987), and there is no reason to believe that Minnesota courts would adopt such a broad presumption in this case when the evidence presented indicates that Stringer would not have heeded any warning. The court thus declines to apply this presumption in this case. Plaintiff's arguments are entirely speculative, and there is no affirmative evidence that Stringer himself would have refrained from practicing on July 31 or otherwise altered his conduct and avoided the injury in response to a warning issued by Defendants. There is thus no genuine issue of material fact as to whether a warning would have changed Stringer's behavior.

###    b.    Whether a Warning Would Have Changed the Vikings' Trainers' and Coaches' Conduct

As to Defendants' second argument, however, the court agrees with Plaintiff that there is a genuine issue of material fact that precludes summary judgment. Defendants argue that the Vikings trainers and coaches already understood the risks surrounding heat-related illnesses, and that

warnings on their products would not have added to the trainers' or coaches' knowledge or caused them to make different decisions about how the July 31 practice would have been conducted or whether Stringer would have been allowed to participate in it. (Def. Mot. Summ. J. pp. 33-34, doc. # 53.)

Plaintiff responds to Defendants' arguments by introducing the testimony and opinions of Dr. Michael Wogalter, a professor of psychology who specializes in warnings. Dr. Wogalter opines that an effective warning would be targeted at, among other groups, the Vikings trainers because they supervise and monitor the players (Dep. of Michael Wogalter p. 84, doc. # 75), and further states that an effective warning would communicate, among other things, "predictive information such as symptoms and signs, whether a person has had heat stroke or heat exhaustion in the past or the past day . . . [because] having heat exhaustion the day prior is predictive of future heat stroke" (id. at p. 136). Medical evidence in the record does tend to establish that suffering an episode of heat exhaustion may predispose an individual to suffer another more serious heat related illness soon afterwards (see ex. 2C to Dep. of E.R. Eichner, doc. # 82), and Charles Barta, the Vikings head trainer who is primarily responsible for determining when players are able to practice or return to practice after injury or illness, testified that he did not know this fact (Barta Dep. pp. 260, 330, doc. # 55). Barta testified that he never considered holding Stringer out of the July 31 practice or otherwise modifying his practice routine, and never warned Stringer about the increased risks associated with practicing a day after suffering a heat related illness. (Id. at pp. 256, 287.) Given that Dr. Wogalter's proposed warning would have alerted the Vikings trainers to this risk, it is reasonable to infer that the trainers would have taken steps to address it by monitoring Stringer more closely, by warning Stringer of the risk, by recommending modifying Stringer's practice routine,

or by recommending that Stringer be held out of practice altogether. Given that the Vikings coaches nearly always followed Barta's recommendations about player health and when to allow players to practice (id. at p. 327), this would support a reasonable inference that alerting the trainers to the risk would have prevented or at least reduced the risk of Stringer suffering a heat stroke. A reasonable jury could thus find that the lack of an appropriate warning was the proximate cause of Stringer's injury.

Defendants have asked the court not to consider Dr. Wogalter's opinions, but the court is not persuaded by Defendants' arguments. Defendants simply argue that Dr. Wogalter's failure to draft a specific, word for word proposed warning and failure to test the efficacy of that warning means that his opinions should be excluded, and cite to Jaurequi v. Carter Mfg. Co., Inc., 173 F.3d 1076 (8th Cir. 1999) and Bourelle v. Crown Equip. Corp., 220 F.3d 532 (7th Cir. 2000).

In Jaurequi the plaintiff was injured by a mobile combine[4] and sued the manufacturer for, among other causes of action, failure to warn. The plaintiff attempted to introduce expert testimony that the existing warnings on the combine were inadequate, but the district court excluded that testimony and granted summary judgment to the manufacturer. 173 F.3d at 1080-81. On appeal, the Eighth Circuit affirmed the exclusion of the expert testimony because both of the plaintiff's proffered experts admitted that they did not know what the original warnings had said, could not identify other manufacturers who used different warnings, and had not "created or even designed a warning device which would have been more appropriate, much less tested its effectiveness[,]" which made the reliability of their opinions questionable. Id. at 1084. More importantly, however,

---

[4] A combine is a piece of farm machinery that harvests and processes various types of crops. Jaurequi, 173 F.3d at 1078.

the Eighth Circuit held that the proffered expert testimony was irrelevant because the previous warnings had twice been painted over, and there was no basis for concluding that different warnings "would have escaped either painter's brush," which cut off all proximate causation. The Eighth Circuit held that "[t]hese breaks in the causal chain render any insufficiencies in the painted-over . . . warning signs irrelevant" and affirmed the exclusion of the expert testimony. Id. at 1085.

Bourelle involved two plaintiffs injured in a warehouse when they were operating a stockpicker. The plaintiffs brought a products liability failure to warn claim and attempted to introduce expert testimony opining that the existing warnings on the stockpicker were inadequate, but the district court excluded the testimony and granted summary judgment to the manufacturer. 220 F.3d at 533-34. The Seventh Circuit affirmed because the proposed expert could not even give a general idea of the language his alternate warning would incorporate, and his failure to draft an alternate warning made his opinion unreliable. Id. at 539.

Questions as to the admissibility of expert testimony are governed by Federal Rule of Evidence 702 and the Supreme Court's interpretation of that rule in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and later cases.[5] Rule 702 encourages courts to admit expert testimony by relaxing the traditional barriers to its admissibility, although the trial judge must still perform his or her "gatekeeper" function and screen proffered expert testimony. See id. at 588; see also Pride v. Bic Corp., 218 F.3d 566, 577 (6th Cir. 2000). The Daubert Court, which addressed scientific

---

[5] Federal Rule of Evidence 702 reads: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

expert testimony, set forth four factors relevant to the admissibility determination: whether the theory or technique can or has been tested, whether the theory or technique has been published and subjected to peer review, whether the technique has a high known or potential rate of error, and whether the theory or technique is generally accepted in the relevant community. Daubert, 509 U.S. at 593-94.

The Supreme Court, in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999), has held that the Daubert gatekeeping function applies to all expert testimony, not just scientific testimony, see id. at 147, but stressed that the inquiry is a flexible one. While the enumerated Daubert factors will often be helpful in resolving the key question of the reliability of the expert's testimony, id. at 152, they are not a "definitive checklist or test" and "the gatekeeping inquiry must be tied to the facts of a particular case." Id. at 150 (internal citations and quotations omitted). Not every factor will be applicable in every case, and "whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." Id. at 153. The court's central task is to make sure that the proffered expert testimony is reliable and relevant.

With this in mind, the court declines to exclude Dr. Wogalter's testimony. Defendants focus on the first Daubert factor - testing - but in this case that factor is not a reasonable measure of reliability. How, exactly, would Dr. Wogalter go about testing the efficacy of an alternative warning? Defendants offer no suggestions, and it is difficult for the court to conceive of a proper testing method. Nor is Defendants' complaint about Dr. Wogalter's failure to draft a word-for-word proposed warning persuasive: unlike the expert in Bourelle who could not even give the gist of a proposed warning, Dr. Wogalter has been reasonably specific in articulating what language and

information would be in his proposed warning.  (Wogalter Dep. pp. 135-36, doc. # 75 (warning should include 1) a sign word to attract attention; 2) either "heat exhaustion," "heat stroke," or "emergency medical condition" to describe the hazard; 3) consequences such as "serious injury," "death," or "brain injury;" and 4) instructions on how to avoid the hazard, such as removing the helmet when not in use and predictive information such as symptoms, signs, and the increased risk of suffering a heat stroke after suffering heat exhaustion or heat stroke within the past day or two).) Furthermore, unlike the proposed expert testimony in Jaurequi Dr. Wogalter's testimony is relevant to the issue of causation, as in this case there is no intervening act cutting off proximate causation. Defendants' arguments and reliance on Jaurequi and Bourelle are not well taken.

Dr. Wogalter testified that he reviewed and relied upon various depositions and numerous scholarly articles when forming his opinion in this case (id. at p. 10; Wogalter Expert Report pp. 1-2, doc. # 98), a technique for forming an expert opinion that is generally accepted.  He also stated that he relied on his background, training, and experience, which includes extensive education in psychology, work experience developing warnings, numerous published articles, and giving prior expert testimony in state and federal courts.  Forming an opinion and proposed warning based on such experience and training would be recognized as acceptable in the psychological community. The court concludes that the methods Dr. Wogalter employed to reach his opinion in this case are sufficiently reliable to permit admission of his testimony.  Defendants' arguments about the lack of testing and specificity in language would more appropriately be raised on cross-examination.  See Finke v. Hunter's View. Ltd., 596 F.Supp.2d 1254, 1268-69 (D. Minn. 2009) (where defendants objected to plaintiff's proposed expert on the grounds that she failed to prepare alternative warnings, court admitted testimony and stated that "[a]ny weaknesses in her opinions based on her . . . lack

of detail in describing a more adequate warning can be addressed during cross-examination").

### 3.    Conclusion

Defendants had a duty to warn of the specific risk of developing heat stroke because it was not an obvious risk, and because the connection between Stringer's heat stroke and Defendants' failure to warn was not remote enough to preclude liability as a matter of law. Furthermore, genuine issues of material fact exist as to Defendants' sophisticated intermediary defense, and as to the issue of causation, i.e., whether a warning could have prompted the Vikings trainers to have changed their behavior and prevented Stringer's injury. Summary judgment is not appropriate on this claim.

### B.    Design Defect

To establish a design defect products liability claim under Minnesota law, a plaintiff must show "(1) that the defendant's product was in a defective condition unreasonably dangerous for its intended use, (2) that the defect existed when the product left the defendant's control; and (3) that the defect was the proximate cause of the injury sustained." Bilotta v. Kelley Co., Inc., 346 N.W.2d 616, 623 n. 3 (Minn. 1984). Although the parties dispute the first and third elements, the court finds that it need only consider the first.

Minnesota courts have adopted a "reasonable care balancing test" that governs the first element. See Holm v. Sponco, 324 N.W.2d 207, 212 (Minn. 1982). Under this test,

> a manufacturer is obligated to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended, as well as an unintended yet reasonably foreseeable use.
>
> What constitutes "reasonable care" will, of course, vary with the surrounding circumstances and will involve "a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm."

Id. (quoting Micallef v. Miehle Co., 39 N.Y.2d 376, 385-86 (1976)). It is not enough to merely show that the product is capable of causing an injury because "the test is not whether a product is capable of producing injury, but whether a reasonable manufacturer would have designed the product in a different way to avoid a foreseeable risk of injury." Holowaty v. McDonald's Corp., 10 F.Supp.2d 1078, 1083 n. 1 (D. Minn. 1998). This is an objective standard that "focuses on the conduct of the manufacturer in evaluating whether its choice of design struck an acceptable balance" between factors such as the likelihood and gravity of harm and the precautions necessary to prevent that harm. Bilotta, 346 N.W.2d at 621-22.

Defendants argue that Plaintiff's design defect claim fails because she has not introduced expert testimony (or any other testimony) establishing that a feasible, alternative safer design existed for Defendants' helmet and shoulder pads. Defendants argue that such testimony is essential to satisfying the first element of Plaintiff's claim, and that without it Plaintiff's claim fails as a matter of law. (Def. Mot. Summ. J. p. 29, doc. # 53.) Plaintiff argues that such evidence is not required under Minnesota law to establish the first element of her design defect claim, and urges the court to reject Defendants' argument and allow the jury "to determine, using the balancing test quoted above, whether these products were unreasonably dangerous for their intended or reasonably anticipated uses[.]" (Pl. Resp. p. 49, doc. # 80.)

In Kallio v. Ford Motor Co., 407 N.W.2d 92 (Minn. 1987), the Minnesota Supreme Court addressed the question of whether proof of an alternative, feasible safer design is required in design defect cases. The plaintiff was injured when his truck, which he had previously shifted into park, began rolling backwards and ran over his legs and one arm while he was attempting to cover the truck bed. The plaintiff argued that the truck's automatic transmission shifting mechanism was

defectively designed because it had a propensity to fail to fully engage the park position, resulting in an "illusory park" where it appeared to the driver that the truck was in park when in reality the truck was not. The defendant requested a jury instruction stating that the plaintiff was required to introduce evidence of an alternative, feasible safer design for the shifting mechanism to prevail on his design defect claim, and also moved for a directed verdict on the ground that the plaintiff had not introduced such evidence. However, the trial court denied the motion for a directed verdict and declined to give the instruction, and the jury subsequently found in favor of the plaintiff. Id. at 94.

After the court of appeals rejected the defendant's arguments the Minnesota Supreme Court affirmed the trial court and upheld the jury's verdict, but with important qualifications. The Minnesota Supreme Court noted its adoption of the reasonable care balancing test in Holm but then reiterated that, unlike in other jurisdictions, in Minnesota one aspect of that test is the plaintiff's burden to establish *unreasonable* dangerousness, not just that the product was capable of producing injury. Id. at 95-96. The Kallio court then stated:

> Obviously, a factor bearing upon the [unreasonable dangerousness] requirement will be the existence or nonexistence of a feasible alternative design. . . . [P]laintiffs asserting a strict liability tort claim based upon alleged defective design of a product ultimately have the burden to prove the elements of the asserted claim. Generally in a case based upon alleged improper design, one of those elements requires production of evidence that the design employed was unreasonably dangerous. To establish a prima facie case that it was unreasonably dangerous normally requires production of evidence of the existence of a feasible, alternative safer design.

Id. at 96. Although the Minnesota Supreme Court stated that proof of an alternative, feasible safer design was not strictly an element of a design defect claim and was not necessarily required in all cases, id. at 96-97, it also pointed out that "[e]xamination of our cases in which plaintiffs have asserted liability of a manufacturer based upon alleged defective design demonstrates that, as a practical matter, successful plaintiffs, almost without fail, introduce evidence of an alternative safer

design[,]" id. at 96 n. 6. Only in the rare case in which a product is judged so dangerous that it should be removed from the market altogether, rather than redesigned, would a plaintiff not need to establish the existence of an alternative design. Id. at 97.

Importantly, the Minnesota Supreme Court pointed out that the plaintiff had in fact presented some evidence, "albeit weak," of the existence of an alternative, feasible safer design, which the defendant countered with evidence that no safer practical design existed. The Kallio court agreed with the trial court that the defendant's proposed instruction should not have been given and that the motion for a directed verdict was properly denied, but relied on the fact that the plaintiff in fact had offered some evidence of an alternative, feasible safer design, deferred to the jury's weighing of the plaintiff's and defendant's competing evidence and resolution of this disputed factual issue, and affirmed the trial court. Id.

Unreasonable dangerousness, not the existence of an alternative, feasible safer design, is the required element of a design defect claim, but Kallio makes it clear that presenting such evidence is effectively the only successful way to establish that a product is unreasonably dangerous.[6] Plaintiff has presented no evidence that an alternative feasible design exists that would make Defendants' helmets and shoulder pads safer with respect to heat-related illnesses. Plaintiff offers no evidence whatsoever, not even the "weak evidence" presented in Kallio, related to an alternative design for Defendants' shoulder pads. While there is some evidence in the record that other helmets incorporate air vents in the crown of the helmet to increase ventilation and, in theory, promote

_____

[6] There is no evidence or argument that Defendants' helmets and shoulder pads are so dangerous that they should be removed from the market altogether instead of being redesigned, and this is not one of the "rare cases" in which the Kallio court recognized that unreasonable dangerousness could be established without evidence of an alternative, safer design.

cooling (see Dep. of Thad Ide p. 74-5, 90-1, doc. # 87), Defendants have presented evidence that

helmets with air vents are no cooler than helmets without such vents (Simbex Study p. 18-19, Dep.

of Pope Moseley ex. 22, doc. # 94-3).[7]  Plaintiff has not rebutted this evidence, and thus, unlike

Kallio, there is no evidence that an alternate, feasible design exists that would make Defendants'

helmets safer.

       Plaintiff's argument that the jury should be allowed to resolve the issue of unreasonable

dangerousness by using the reasonable care balancing test articulated in Holm only helps to illustrate

why evidence of an alternative, feasible safer design is so important to a plaintiff's claim in design

defect cases.  The reasonable care balancing test tasks the jury with "balancing the likelihood of

harm, and the gravity of harm if it happens, against the burden of the precaution which would be

effective to avoid the harm."  Holm, 324 N.W.2d at 212.  While Plaintiff has produced some

evidence pertaining to the first part of the balancing test, there is nothing for the jury to weigh that

evidence against because there is no evidence as to what type and degree of burden developing

effective precautions would impose on Defendants.  Evidence of an existing alternative, feasible

safer design would allow a jury to weigh the burden of adopting that alternative design against the

likelihood and gravity of harm to determine if the manufacturer's design decision to not adopt the

alternative design was reasonable.  Without evidence of *how* Defendants could have designed the

helmet and shoulder pads differently, how can the jury determine whether Defendants' design

---

[7] Plaintiff cites this study for its conclusion that the helmets' insulation inhibits natural cooling and that alternative methods of cooling should be considered (Pl. Resp. p. 20 n. 6, doc. # 80), but merely showing that the helmets are potentially dangerous because they inhibit cooling is not sufficient.  Plaintiff must show that the helmets pose an unreasonable danger because they could be designed differently to reduce or eliminate that danger.  Holowaty, 10 F.Supp.2d at 1083 n. 1.

decisions were reasonable, i.e. whether Defendants *should* have designed the products differently?

Plaintiff would have the jury presume that the likelihood and gravity of harm posed by Defendants' helmet and shoulder pads would automatically outweigh any burden that might be imposed on Defendants by adopting different designs as precautions to avoid that harm. Plaintiff, however, cannot avoid her burden of proof in this way. Plaintiff has the burden of proof to present evidence sufficient to establish that the dangers posed by Defendants' products outweigh the burden of taking precautions against such dangers. This would establish that a reasonable manufacturer would have designed the products differently and that Defendants' products were unreasonably dangerous, which is the first element of Plaintiff's claim. In this case there is no evidence tending to show that Plaintiff could satisfy that burden at trial. Plaintiff cannot establish a genuine issue of material fact as to one of the required elements of her design defect claim, and summary judgment is appropriate for Defendants on Plaintiff's design defect claim.

## C. Implied Warranty

Plaintiff alleges that Defendants breached the implied warranty of merchantability because its helmet and shoulder pads were not fit for the ordinary purposes for which they were intended (Compl. ¶ 63, doc. # 1), but the court agrees with Defendants that "[s]trict products liability has effectively preempted implied warranty claims where personal injury is involved." Masepohl v. American Tobacco Co. Inc., 974 F.Supp. 1245, 1253 (D. Minn. 1997) (quoting Nimeth v. Prest Equip. Co., No. C1-93-685, 1993 WL 328767 (Minn. Ct. App. Aug. 31, 1993)). The one case Plaintiff cites in response to Defendants' argument, Bach v. Gehl, No. A05-1843, 2006 WL 2865166 (Minn. Ct. App. Oct. 10, 2006), deals entirely with evidentiary objections and does not address the issue, and the court does not find it persuasive. Plaintiff's implied warranty claim is preempted by

her products liability claims, and summary judgment for Defendants is appropriate on this claim.

**D.     Express Warranty**

Plaintiff's Complaint alleges that Defendants expressly warranted that the helmet and shoulder pads were safe for their intended use.  (Compl. ¶ 60, doc. # 1.)  Defendants argue that creation of an express warranty requires an express affirmation of fact that becomes part of the bargain, and that there is no evidence that Defendants ever made an express affirmation of fact to Stringer or the Vikings about the safety of the helmet and shoulder pads.  (Def. Mot. Summ. J. p. 40-41, doc. # 53.)  Plaintiff has not responded to Defendants' arguments, and although the court cannot grant summary judgment simply because the opposing party has not responded, see Carver v. Bunch, 946 F.2d 451, 455 (6th Cir. 1991), in this case the court finds that Defendants have satisfied their burden to show the absence of a genuine issue of material fact.  Summary judgment is therefore appropriate for Defendants on Plaintiff's express warranty claim.

**IV.     Conclusion**

For the reasons stated above, the court **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's design defect, implied warranty, and express warranty claims, but **DENIES** the Motion as to Plaintiff's failure to warn claim.

**IT IS SO ORDERED.**


Date: July 10, 2009                                              **/s/ John D. Holschuh**
                                                                 John D. Holschuh, Judge
                                                                 United States District Court